1  STEVEN A. ELLIS (SBN 171742)
   *sellis@goodwinprocter.com*
2  **GOODWIN PROCTER** LLP
   601 S. Figueroa Street, 41st Floor
3  Los Angeles, CA  90017
   Tel.: 213.426.2500
4  Fax.: 213.623.1673

5  JAMES W. MCGARRY (*pro hac vice*)
   *jmcgarry@goodwinprocter.com*
6  **GOODWIN PROCTER** LLP
   53 State Street
7  Boston, MA  02109
   Tel.: 617.570.1000
8  Fax.: 617.523.1231

9  ALYSSA A. SUSSMAN (*pro hac vice*)
   *asussman@goodwinprocter.com*
10 **GOODWIN PROCTER** LLP
   The New York Times Building
11 620 Eighth Avenue
   New York, NY  10018-1405
12 Tel.: 212.813.8800
   Fax: 212.355.3333
13
   Attorneys for Defendants:
14 BANK OF AMERICA, N.A., and BANK OF
   AMERICA CORPORATION

15

**UNITED STATES DISTRICT COURT**

16

**EASTERN DISTRICT OF CALIFORNIA**

17

**SACRAMENTO DIVISION**

18

|  |  |
|---|---|
| 19  ANTONIO ESQUIVEL and BEATRIZ ESQUIVEL, individually, on behalf of all others similarly situated, and on behalf of the 20  general public, | Case No. 2:12-cv-02502-GEB-KJN |
| 21         Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| 22         v. | Date:       July 27, 2015 Time:       9:00am Courtroom:  10 |
| 23  BANK OF AMERICA, N.A.  and BANK OF AMERICA CORPORATION | Judge:      Hon.  Garland E.  Burrell, Jr. |
| 24         Defendants. |  |
| 25 |  |

26

27

28

# TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................................ 3

    A.    FHA-HAMP .............................................................................................. 3

    B.    Internal Processes ..................................................................................... 4

    C.    Plaintiffs' Loan ......................................................................................... 6

    D.    The Complaint and Motion for Class Certification .................................. 8

    E.    The Class-Certification Record ................................................................ 9

ARGUMENT ........................................................................................................... 9

I.    THE PATENTLY OVERBROAD CLASS DEFINITION DEFEATS
    CERTIFICATION. .......................................................................................... 9

    A.    The Class Includes Many Borrowers With No Injury and No Standing ............... 10

    B.    An Overbroad Class Violates Rule 23's Ascertainability Requirement. .............. 12

II.    THERE IS NO COMMON QUESTION OF LAW OR FACT. ....................... 13

    A.    Plaintiffs Do Not Identify Common Issues Capable of Classwide
    Resolution .............................................................................................. 14

        1.    Allegedly "Uniform" Contracts Do Not Create Commonality. ................ 14

        2.    Purported "Systematic" Policies Do Not Create Commonality. .............. 18

    B.    The Class Definition Offers No Shortcut Around the Individualized
    Inquiries. ............................................................................................... 21

        1.    Not Every "Signed and Returned" Agreement is a Valid One ................. 22

        2.    Recording the HUD Lien Does Not Waive Contractual Conditions. ....... 23

III.    PLAINTIFFS FAIL TO SATISFY THE OTHER REQUIREMENTS OF RULE
    23. ................................................................................................................. 27

    A.    Plaintiffs Do Not Show They Are Typical of the Purported Class. ..................... 27

    B.    Plaintiffs Cannot Show They Are Adequate Class Representatives. .................... 29

    C.    Plaintiffs Fail to Carry Their Burden on Rule 23(b). ............................................ 30

        1.    Even If There Were Issues Capable of Classwide Adjudication,
        They Do Not Predominate Over Individual Issues. ................................. 30

        2.    Plaintiffs Fail to Show That a Class Action is a Superior Method of
        Adjudication. .......................................................................................... 34

CONCLUSION ...................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abbot v. Am. Elec. Power, Inc.*,
   2012 WL 3260406 (S.D. W. Va. Aug. 8, 2012)..........................................................................29

*Algarin v. Maybelline, LLC*,
   300 F.R.D. 444 (S.D. Cal. 2014)..........................................................................................33

*Arabian v. Sony Elec., Inc.*,
   2007 WL 627977 (S.D. Cal. Feb. 22, 2007) ...........................................................................30

*Augustin v. Jablonsky*,
   819 F. Supp. 2d 153 (E.D. N.Y. 2011)....................................................................................32

*In re Autozone, Inc.*,
   289 F.R.D. 526 (N.D. Cal. 2012) ...........................................................................................13

*Avritt v. Reliastar Life Ins. Co.*,
   615 F.3d 1023 (8th Cir. 2010)..............................................................................................10

*Ballard v. Bank of Am., N.A.*,
   2013 WL 4807193 (C.D. Cal. Sept. 6, 2013)......................................................................2, 28

*In re Bank of Am. HAMP Contract Litig.*,
   2013 WL 4759649 (D. Mass. Sept. 4, 2013).........................................................2, 18, 31, 34

*Beatty v. Bank of Am., N.A.*,
   2012 WL 1606358 (S.D. Tex. Apr. 30, 2012) ........................................................................34

*Brown v. Brewer*,
   2009 WL 1574556 (C.D. Cal. May 29, 2009)........................................................................30

*Burton v. Nationstar Mortg., LLC*,
   2014 WL 5035163 (E.D. Cal. Oct. 8, 2014) ........................................................2, 11, 12, 27

*Campion v. Old Republic Home Prot. Co.*,
   272 F.R.D. 517 (S.D. Cal. 2011)......................................................................................31, 33

*Campusano v. BAC Home Loans Servicing, LP*,
   2013 WL 2302676 (C.D. Cal. Apr. 29, 2013)................................................................. *passim*

*Chanthavong v. Aurora Loan Servs., Inc.*,
   2011 WL 6012353 (E.D. Cal. Dec. 1, 2011)..........................................................................27

*Chesner v. Stewart Title Guar. Co.*,
   2009 U.S. Dist. LEXIS 22453 (N.D. Ohio Jan. 9, 2009) ......................................................26

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ...........................................................................................31

*Donicker Corp. v. Pittsburgh Nat'l Bank*,
    1994 U.S. App. LEXIS 31528 (9th Cir. 1994)........................................................26

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)...................................................................................27

*Georgine v. Amchem Prods., Inc.*,
    83 F.3d 610 (3d Cir. 1996) ......................................................................................34

*Glover v. Udren*,
    2013 U.S. Dist. LEXIS 170246 (W.D. Pa. July 18, 2013)......................................18

*In re Google AdWords Litig.*,
    2012 WL 28068 (N.D. Cal. Jan. 5, 2012) ...............................................................33

*Hammett v. Am. Bankers Ins. Co.*,
    203 F.R.D. 690 (S.D. Fla. 2001) .............................................................................32

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992)...................................................................................27

*Hernandez v. Specialized Loan Servicing, LLC*,
    2015 WL 1401784 (C.D. Cal. Mar. 23, 2015) ........................................................29

*Herrera v. LCS Fin. Servs. Corp.*,
    274 F.R.D. 666 (N.D. Cal. 2011).............................................................................33

*Jackson v. Fannie Mae*,
    2012 U.S. Dist. LEXIS 41885 (D. Or. Mar. 26, 2012) ...........................................25

*Justo v. Indymac Bancorp*,
    2010 WL 623715 (C.D. Cal. Feb. 19, 2010)...........................................................22

*Khan v. CitiMortgage, Inc.*,
    975 F. Supp. 2d 1127 (E.D. Cal. 2013) .............................................................22, 23

*In re Knickerbocker*,
    827 F.2d 281 (8th Cir. 1987)...................................................................................32

*Krouse v. BAC Home Loans Servicing, LP*,
    2011 WL 6100406 (E.D. Cal. Dec. 6, 2011)...........................................................27

*Landry v. Price Waterhouse Chartered Accountants*,
    123 F.R.D. 474 (S.D. N.Y. 1989)............................................................................28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................10

-iii-

*Mazur v. eBay Inc.*,
  257 F.R.D. 563 (N.D. Cal. 2009) ...............................................................12, 13, 28

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ...............................................................................10

*In re Montano*,
  488 B.R. 695 (Bankr. D. N.M. 2013) ....................................................................32

*Parker v. Bank of Am., N.A.*,
  2015 WL 1737278 (D. D.C. Apr. 16, 2015) .........................................2, 20, 21, 23

*In re Peregrine Sys., Inc. Sec. Litig.*,
  2002 WL 32769239 (S.D. Cal. Oct. 11, 2002).......................................................28

*Ramirez v. Trans Union, LLC*,
  301 F.R.D. 408 (N.D. Cal. 2014) ..........................................................................33

*Randleman v. Fid. Nat'l Title Ins.*,
  264 F.R.D. 298 (N.D. Ohio 2009)..........................................................................26

*Red v. Kraft Foods, Inc.*,
  2012 WL 8019257 (C.D. Cal. Apr. 12, 2012).........................................................34

*Simon v. Ashworth, Inc.*,
  2007 WL 4811932 (C.D. Cal. Sept. 28, 2007) .......................................................29

*Stearns v. Select Comfort Retail Corp.*,
  763 F. Supp. 2d 1128 (N.D. Cal. 2010) .................................................................13

*Stephens v. Seven Seventeen HB Phila. Corp. No. 2*,
  2004 U.S. Dist. LEXIS 14597 (E.D. Pa. July 28, 2004) ........................................33

*Thomas v. Arrow Fin. Servs., LLC*,
  2006 U.S. Dist. LEXIS 63156 (N.D. Ill. Aug. 17, 2006) ........................................33

*Tijero v. Aaron Bros., Inc.*,
  2013 WL 60464 (N.D. Cal. Jan. 2, 2013) ..............................................................12

*True v. Conagra Foods, Inc.*,
  2011 U.S. Dist. LEXIS 6770 (W.D. Mo. Jan. 4, 2011)...........................................33

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996)................................................................................34

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) .....................................................................10, 13, 19, 23

*Wells Fargo Bank, N.A. v. Boutris*,
  265 F. Supp. 2d 1162 (E.D. Cal. 2003) .................................................................25

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    Case No. 2:12-CV-02502-GEB-KJN

*Williams v. Oberon Media, Inc.*,
 468 F. App'x 768 (9th Cir. 2012)................................................................12


**California Cases**

*Domarad v. Fisher & Burke, Inc.*,
 270 Cal. App. 2d 543 (1969)................................................................25

*Monson v. Fischer*,
 118 Cal. App. 503 (1931)................................................................25

*In re Tobacco II Cases*,
 46 Cal. 4th 298 (2009)................................................................33

*Trujillo v. First Am. Registry, Inc.*,
 157 Cal. App. 4th 628 (2007)................................................................29


**Federal Statutes**

12 U.S.C. § 1701 *et seq.*................................................................3

Helping Families Save Their Homes Act of 2009, Pub. L. No. 111-22, 123 Stat.
 1632 (2009) ................................................................3


**California Statutes**

Cal. Bus. & Prof. Code § 17204................................................................29, 33

Cal. Civ. Code § 1217 ................................................................25

Cal. Civ. Code § 1624(a)................................................................23

Cal. Civ. Code § 1698(a)................................................................22

Cal. Civ. Code § 2922 ................................................................22

California Consumer Credit Reporting Agencies Act................................................................8, 32, 33

California Rosenthal Act ................................................................8, 32


**Other Authorities**

2 Farnsworth on Contracts § 8.6 at 453 (2d ed. 1990)................................................................25

30 Cal. Jur. 3d, Estoppel & Waiver § 24 ...................................................................................26

Fed. R. Civ. P. 23 ................................................................................................. *passim*

John D. Calamari & Joseph M. Perillo, The Law of Contracts § 11-31 (3rd ed. 1987)........................................................................................................................25

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    Case No. 2:12-CV-02502-GEB-KJN

Plaintiffs Antonio and Beatriz Esquivel defaulted on their mortgage loan and received a permanent loan modification from Bank of America under the Federal Housing Administration's Home Affordable Modification Program ("FHA-HAMP").  They complain that Bank of America took too long to implement their modification, and therefore seek to certify a class of borrowers on the theory that Bank of America took too long to implement *everybody's* modification.  That putative class is defined to include every borrower who signed and returned an FHA-HAMP permanent-modification agreement—without regard to how long it took Bank of America to modify their loans.  Plaintiffs do not support their motion with any evidence that every other borrower (or *any* other borrower) had to wait too long for their modification.  Plaintiffs simply ask this Court to assume that however long it took, it was too long, and constituted a breach of Bank of America's contractual obligations and a violation of various California statutes.

Numerous courts have denied class certification of such claims.  These courts have recognized that to prove that a servicer breached a contractual obligation to modify a borrower's loan, plaintiffs must first prove that the servicer *had* such an obligation, and that inquiry requires the Court to consult each and every modification agreement at issue to determine what conditions are spelled out, and *then* to consult each and every borrower's servicing history to determine whether the borrower in fact satisfied each condition.  Thus, in *Campusano v. BAC Home Loans Servicing, LP*, 2013 WL 2302676 (C.D. Cal. Apr. 29, 2013), the Central District of California rejected exactly the same arguments in favor of class certification that Plaintiffs make here.  The *Campusano* plaintiffs attempted to evade individual inquiries by arguing that the material terms in every modification agreement were the same and that the Court could infer a classwide breach of contract because Bank of America failed to implement modifications on a timely basis as a matter of company policy—specifically, an alleged policy of subjecting every modification to a quality-control review before booking the new terms.  *Campusano* held that these contentions, even if true, did not establish commonality because individual inquiries were still necessary to determine whether each borrower had satisfied all of the conditions set forth in the modification documents.

Following *Campusano*, numerous other courts across the country have denied class certification on similar grounds (as well as for various other reasons that were not at issue in

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                                    Case No. 2:12-CV-02502-GEB-KJN

1  *Campusano*, but loom large in this case—such as the wildly overbroad class definition that

2  includes borrowers with no discernible claim or harm.  First, in a Multi-District Litigation

3  accusing Bank of America of breaching HAMP trial modification agreements, the District of

4  Massachusetts held that individualized inquiries into borrowers' performance of their own

5  obligations and their satisfaction of the agreements' conditions predominated over any common

6  questions and foreclosed class certification.  *In re Bank of Am. HAMP Contract Litig.*, 2013 WL

7  4759649 (D. Mass. Sept. 4, 2013).  Then, the Central District of California denied certification of

8  a California UCL class on the ground that a plaintiff who failed to receive a loan modification for

9  one reason could not be "typical" of a class of borrowers who may have failed to receive them for

10  other reasons.  *Ballard v. Bank of Am., N.A.*, 2013 WL 4807193, at *5 (C.D. Cal. Sept. 6, 2013).

11  Next, a Court in this District denied certification on standing and typicality grounds (among

12  others), finding that a plaintiff claiming injury from his failure to receive a loan modification could

13  not represent a class that included borrowers who did not experience "any alleged delay in

14  booking" and therefore suffered no damages.  *Burton v. Nationstar Mortg., LLC*, 2014 WL

15  5035163 (E.D. Cal. Oct. 8, 2014), *report and recommendation adopted*, 2014 WL 5528140 (E.D.

16  Cal. Oct. 31, 2014).  Most recently, the District of D.C. cited the "wide variety of conditions"

17  appearing in loan-modification agreements as a factor that defeated Rule 23 commonality, and

18  also rejected the plaintiff's contentions that commonality was present on the basis of "uniform"

19  bank policies.  *Parker v. Bank of Am., N.A.*, 2015 WL 1737278 (D. D.C. Apr. 16, 2015).

20  　　　In all material respects, this case is no different.  Plaintiffs make the same arguments for

21  class certification, and they fail for the same reasons.  Indeed, they cannot satisfy any of the

22  requirements of Rule 23.  They have not proposed an ascertainable class of borrowers that have

23  any harm or standing to assert a claim at all.  They have not proposed a common method to

24  adjudicate all of the contract formation and performance questions in "one stroke," as the Supreme

25  Court requires for commonality.  They are not typical of the class they seek to represent because

26  the entire premise of their claim is that they suffered an unusual and atypical eight-month delay in

27  getting their modification implemented. ████████████████████████████████████████

28  ████████████████████    They are not adequate class representatives because they confessed

-2-

to be completely in the dark as to what this lawsuit is about and have given *carte blanche* deference to their attorneys at every turn.  They have asserted claims based on highly individualized damages theories and proposed no common method for classwide damages computations, defeating predominance.  And they cannot establish superiority where borrowers can and do bring the same sort of claims on an individual basis.  In sum, whatever the merits of Plaintiffs' claims on an individual basis, when it comes to the question of whether they can represent a class, this is not even a close case.  Class certification should be denied.

<b><u>BACKGROUND</u></b>

**A.  FHA-HAMP**

The Federal Housing Administration ("FHA") is a division of the Department of Housing and Urban Development ("HUD") that provides mortgage insurance on loans made by approved lenders throughout the country, in order to promote lending to first-time homeowners and low-income borrowers who may have trouble qualifying for conventional loans.  *See* 12 U.S.C. § 1701 *et seq.*  FHA mortgage insurance protects lenders against the risk of borrower defaults.

In April 2009, the U.S. Treasury Department launched the Home Affordable Modification Program ("HAMP") as part of its campaign to combat rising rates of default and foreclosure.  HAMP helps borrowers at risk of foreclosure cure their defaults and lower their monthly payments through a combination of interest-rate reductions, term extensions, recapitalizing overdue payments as additional principal, forgiving or forbearing a portion of the principal balance, and other accommodations.  *See generally* HAMP Supplemental Directive ("SD") 09-01 (Apr. 6, 2009) (Request for Judicial Notice ("RJN"), Ex. A).  FHA-insured loans were initially excluded from HAMP while the FHA developed its own standalone program.  HUD Mortgagee Letter ("ML") 2009-23, at 1 (July 30, 2009) (RJN Ex. B); *see also* SD 09-01 at 3 (RJN Ex. A).  On May 20, 2009, the Helping Families Save Their Homes Act of 2009 was enacted and gave the FHA authority to create programs designed to limit foreclosures on FHA-insured mortgages.  Pub. L. No. 111-22, 123 Stat. 1632 (2009); ML 2009-23 (RJN Ex. B).  On July 30, 2009, FHA announced the creation of FHA-HAMP, effective August 15, 2009, to provide HAMP-like modifications to borrowers with FHA-insured loans who do not qualify for other modification programs and have

-3-

debt-to-income ratios that will allow for sustainable modified payments.  ML 2009-23 at 2-3 (RJN Ex. B).

The evolving program requirements for FHA-HAMP are set forth in a series of Mortgagee Letters published by the FHA.  *See* ML 2009-23; 2009-35; 2009-39; 2010-04; 2010-11; 2012-22; 2013-15; 2013-19; 2013-32; 2015-07 (RJN Ex. B–K).  Like HAMP, FHA-HAMP generally requires eligible borrowers to complete a three-month trial period before being offered a permanent modification.  ML 2009-23 at 1 (RJN Ex. B).  Unique to FHA-HAMP is a feature that combines the loan modification with a "partial claim" note.  The partial-claim component is a principal deferment that reduces the unpaid principal balance of the loan by up to 30 percent as of the date of default.  *Id.* at 2.  To receive the modification, borrowers must execute a partial-claim note payable to HUD in the amount of the deferred principal, and servicers are in turn required to record the partial claim security instrument in the local land registries within five business days of execution.  ML 2009-23 Att. at 3 (RJN Ex. B); ML 2003-19 at 1, 6 (RJN Ex. L).  The partial claim bears no interest and becomes due at maturity, upon the sale of the property, or upon a payoff or refinancing of the loan.  ML 2009-23 Att. at 4 (RJN Ex. B).  The remaining principal is re-amortized to a 30-year fixed-rate mortgage within parameters set by the FHA.  *Id.* at 1.

This structure has evolved over time.  FHA-HAMP originally required a partial claim in combination with a modification, but on November 16, 2012, FHA-HAMP was expanded to allow standalone modifications and standalone partial claims under certain conditions, while also retaining the combination option.  ML 2012-22 at 4 (RJN Ex. G).  Eligibility requirements pertaining to debt-to-income ratios, default histories, and the size of the partial claim have also changed.

**B.  Internal Processes**

Bank of America has modified thousands of FHA-HAMP loans in California alone.  Ex. 1 ¶ 13.[1]  But loans do not modify themselves.  Bank of America, like any other servicer, has a variety of processes in place for reviewing the necessary paperwork, confirming that everything is

---

[1] References to "Ex." correspond to Exhibits to the Declaration of Alyssa Sussman filed with this brief, unless otherwise indicated.

1    in order, and making the actual system changes necessary to modify the loan terms.  Receipt of the

2    signed modification documents from a borrower is only part of this process, since receipt alone

3    does not mean that the documents were filled out correctly or that the borrower has adhered to all

4    of the terms.  Ex. 2 at 67:12-19.

5    ██████████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████████

8    Ex. 2 at 13:15-21, 36:4-5, 41:11-23; Ex. 3 at 18:19-19:5.  ████████

9    ████████████████████████████████████████

10   ██████████  Ex. 2 at 87:6-88:10.  ████████████████████  *Id.* at 50:13-

11   15.  ██████████████████████████████████

12   ███████████████████  *Id.* at 52:25-53:4.  ████████████████

13   ████████████████████████████████████████

14   ████████████████████████████████████

15   ██████████████  *Id.* at 50:16-25, 51:4-15; Ex. 3 at 56:4-10.

16   ██████████████████████████████████████

17   ███████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████  Ex. 2 at 15:17-23, 51:23-52:4.  ██

20   ████████████████████████████████████  *Id.* █

21   ████████████████████████████████████████

22   ███████████████████████████████████.  *Id.*  ████████

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████  *Id.* at 54:21-55:17; 69:8-20.

26   ████████████████████████████████████

27   ████████████████████████████████████████

28   ██████████████████████████████████

1       ██████████████████████████████ *Id.* at 55:18-22; 70:1-12. ████

2       ████████████████████████████████████████████

3       ██████████████████ *Id.* at 68:5-15.

## C. Plaintiffs' Loan

Plaintiffs took out a $322,975 loan in June 2009 to refinance the mortgage on their Dixon, California property, co-signed by Ms. Esquivel's sister, Irma Escobar.  Complaint, ECF No. 1 ("Compl.") ¶¶ 12, 13.  Bank of America became the servicer shortly thereafter.  Mot. at 4. Plaintiffs' loan required monthly payments of approximately $2,000 and carried an interest rate of 5%.  Ex. 4 at 1785.  By November 2009, Plaintiffs were having difficulty making their payments. Ex. 5 at 443; Ex. 1 at ¶ 26; *see also* Plaintiffs' Motion for Class Certification, ECF No. 64 ("Mot.") at 4.  In June 2011, after becoming two months delinquent on their mortgage payments, Plaintiffs contacted a Vacaville Housing Authority employee, Patricia Reyes, who provided Plaintiffs with delinquency counseling, and helped them apply for a loan modification through Bank of America in or around August 2011.  Ex. 8 at 57:18-62:9; Ex. 5 at 446; Mot. at 4.

In September 2011, Bank of America offered Plaintiffs an FHA-HAMP trial modification with monthly payments of $1,509.52 from October to December 2011.  Compl. ¶ 16.  Plaintiffs made the trial payments until February 2012, when Bank of America sent them a Commitment and Offer to Modify Mortgage and for Partial Claim, a proposed loan modification agreement, and a HUD Subordinate Note and Deed of Trust.  *Id.* ¶¶ 16-17, *id.*  Exs. 1-4; Mot. at 4; Declaration of Noah Zinner in Support of Plaintiffs' Motion to Certify Class, ECF No. 64-1 ("Zinner Decl.") Ex. 1.  Under the terms of the offer, Bank of America would decrease Plaintiffs' unpaid principal balance to $226,755.02, their monthly payments to $1,515.96, and their interest rate to 4.625%, and HUD would retain a subordinate lien as security for its partial claim on the deferred principal. Zinner Decl. Ex. 1 at 670.  The permanent modification was contingent on Plaintiffs (and any guarantors) executing and returning all the permanent modification documents, continuing to qualify for FHA-HAMP, and the property title remaining "free from any defect, encumbrance, unauthorized conveyance or any other irregularity," among other conditions.  *Id.* Ex. 1 at ESQ669, 672, *id.* Ex. 2 at 675-76, 677-78.  The offer also cautioned Plaintiffs—clearly and expressly—that

-6-

collection action on their overdue balance would "continue . . . until your FHA-HAMP process is completed."  *Id.* Ex. 1 at 669.

Plaintiffs signed and returned the permanent-modification agreement and subordinate note and deed of trust to Bank of America around February 25, 2012 (Compl. ¶ 20), but some of the signatures were in the wrong places, and they did not sign and return the Commitment (or obtain Ms. Escobar's signature on any of the documents).  Ex. 7 at 232, 238, 240-42; Ex. 18; Ex. 19; Ex. 8 at 84:3-4, 96:4-8, 15-21.  Bank of America did not countersign the agreement at this time, and instead began contacting Plaintiffs to obtain the necessary signatures; the Bank resolved the issue by September 2012.  Ex. 10; Ex. 7 at 147, 214, 232, 238, 240-42; Ex. 8 at 102:24-25, 103:4-10, 107:20-108:7; Ex. 9 at 1322; Ex. 18; Ex. 19.  Meanwhile, the subordinate lien was recorded on June 5, 2012.  Mot. at 5.

Plaintiffs made payments in the modified amount until September 2012, when two of their payments were returned due to a system error.  Ex. 7 at 147, 163; Ex. 8 at 97:17-98:17.  Bank of America corrected the issue and asked Plaintiffs to resubmit the payments, but instead of doing so, Plaintiffs sent the payments to their attorneys.  Ex. 7 at 147; Ex. 8 at 97:17-98:17.  They have not made any payments to Bank of America since.  Ex. 5 at 448-453; Ex. 8 at 97:24-98:3.

Bank of America processed transactions modifying the principal, interest rate, and maturity date of Plaintiffs' loan based on the permanent-modification terms on October 26, 2012, retroactive to the modification's effective date of February 1, 2012.  ECF No. 35 at 2, 35-1 ¶¶ 4, 5; Ex. 7 at 126; Ex. 5 at 451; Ex. 6 at 29.  The modification also brought Plaintiffs' loan current through July 2012 (the last payment Plaintiffs made), waived all late charges, and returned the loan to normal servicing.  ECF No. 35 at 2, 35-1 ¶ 6; Ex. 7 at 88-106; Ex. 5 at 452.  On November 16, 2012, Bank of America sent a notice to the credit-reporting agencies to change the reporting on Plaintiffs' loan to "Current" from February 2012 through October 2012.  Ex. 17; Ex. 13.

Plaintiffs continue to live on the property, even though they have not made a loan payment to Bank of America in almost three years.  Ex. 5 at 448-53; Ex. 11 at 19:7-9; Ex. 8 at 135:11-13.

### D.  The Complaint and Motion for Class Certification

Plaintiffs assert claims for breach of contract and for violation of the California Consumer Credit Reporting Agencies Act, the Rosenthal Act, and the UCL, based on allegations that Bank of America breached their permanent-modification agreement by failing to modify their loan, continuing to collect on the loan, and reporting the loan as delinquent before it was modified. Compl. ¶¶ 44, 46, 72-73, 79.  In their complaint, Plaintiffs sought to represent a class of "[a]ll California residents who, since 2008, were offered, accepted and performed under the terms of permanent loan modifications from Bank of America and for which modifications Bank of America later denied that any such modifications existed, while falsely reported [sic] the loans as delinquent to the credit bureaus," in addition to a subclass limited to FHA-HAMP.  *Id.* ¶ 31.

In the instant motion for class certification, Plaintiffs seek certification of a class which is narrower in some respects (as it is now completely limited to FHA HAMP), but vastly broader in others, in that it no longer makes any distinction between borrowers whose loans were modified and those for whom a modification was denied.  The new putative class is now defined as "all California residential mortgage loan borrowers who, since August 15, 2009, signed and returned Bank of America's offer of a permanent FHA HAMP modification where Bank of America recorded a lien in favor of the Secretary of Housing and Urban Development pursuant to the modification."  Mot. at 7.

Unlike the complaint, which alleged that Bank of America failed to modify Plaintiffs' loan at all, their class-certification motion is based on the contention that Bank of America breached the modification agreement by taking too long to implement the modification and reporting them as delinquent in the interim.  Mot. at 5-6.  Plaintiffs argue that "borrowers' return of properly signed modification agreements created a binding permanent modification contract with the bank" that supposedly obligates the Bank to modify loans immediately, although elsewhere they suggest that it is the Bank's recording of the HUD lien that creates the binding obligation.  Mot. at 1, 11-12.  In either case, they claim that Bank of America breaches this obligation by ███████████████

███████████████████████████████████████████████████████████

███████████████████████████ *Id.* at 6.  ███████████████████

1  ███████████████████████████████████████████████, but is never instantaneous, and based on

2  that theory they claim that Bank of America is liable to *every* borrower who returned an FHA-

3  HAMP modification agreement and partial claim.  *Id.*

4  **E.  The Class-Certification Record**

5       Plaintiffs have taken discovery in an effort to support their class certification motion for

6  more than 16 months.  Despite this, they do not support their motion with any actual data on

7  whether any other borrowers experienced the alleged delays and harms that Plaintiffs claim they

8  have experienced.  Plaintiffs base their motion almost exclusively on deposition testimony about

9  the Bank's practices and procedures, along with a single policy document on the subject of credit

10  reporting and some documents from Plaintiffs' own individual loan file.

11       Bank of America collected data on borrowers alleged to belong to the putative class in

12  order to respond to Plaintiffs' discovery requests, and provided the raw data to economist David

13  M. Skanderson, Ph.D., for expert analysis.  Dr. Skanderson's analysis shows that the picture

14  Plaintiffs try to paint of borrowers suffering systemic delays in the implementation of their FHA-

15  HAMP modifications does not accord with reality.  ██████████████████████████████████

16  ███████████████████████████████████████████████████████████████ Ex. 1 ¶

17  14.  ████████████████████████████████████████████████████ *Id.* ¶ 15.

18  ████████████████████████████████████████████████████████████████████

19  ██████████████████████████████████ Plaintiffs try to sweep all of these

20  borrowers into their putative class, without regard to the bucket in which they fall.

21                   **<u>ARGUMENT</u>**

22  **I.  THE PATENTLY OVERBROAD CLASS DEFINITION DEFEATS CERTIFICATION.**

23       In their complaint, Plaintiffs accused Bank of America of "reneg[ing]" on a promise to

24  modify their mortgage loan, allegedly by "continu[ing] to treat the loan as if it were in default"

25  after they had signed and returned a modification agreement.  Compl. ¶¶ 4, 23, 48.  They sought to

26  represent two putative classes defined to encompass borrowers who reached loan-modification

27  agreements with Bank of America "where Bank of America later denied that any such

28  modification existed."  *Id.* ¶ 31.

The class that Plaintiffs seek to certify in the pending motion is, however, strikingly different.  Plaintiffs do not limit the class to borrowers who reached loan-modification agreements and failed to receive a modification (whether as a result of the Bank denying "the existence of the permanent modification," *id.*, or otherwise).  Instead, they seek certification of a class that can sweep in *any* borrower who signed and returned an FHA HAMP modification agreement since August 15, 2009, virtually without regard to how Bank of America handled their modifications and thus without regard to whether each putative class member has any injury at all, much less an injury in common with the one claimed by the Plaintiffs.  Mot. at 7.  A class so broadly defined is uncertifiable, for multiple reasons.

**A.  The Class Includes Many Borrowers With No Injury and No Standing.**

In a putative class action, "[n]o class may be certified that contains members lacking Article III standing." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (quoting *Denney v. Deutsche Bank AG,* 443 F.3d 253, 264 (2d Cir. 2006)); *see also Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) ("[A] named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves."); *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2552 (2011) (acknowledging "the necessity" to exclude putative class members who "lack[ed] standing" from the proposed class).  Among other requirements, a litigant must have suffered an actual, concrete, and particularized injury to have standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiffs here make no effort to ensure that their class definition is so limited.

The putative class is defined to include "[a]ll California residential mortgage loan borrowers who, since August 15, 2009, signed and returned Bank of America's offer of a permanent FHA HAMP modification where Bank of America recorded a lien in favor of the Secretary of Housing and Urban Development pursuant to the modification." Mot. at 7.  There is no language whatsoever limiting the class to borrowers who have a claim against Bank of America.  ████████████████████████████████████████████

████████████████████  (Ex. 1 ¶ 15)  ████████████████████████████

████████████████████████████████████████████████████████████

-10-

1    ███████     It is perhaps conceivable that *some* borrowers who signed and returned FHA HAMP

2    modification agreements might have some viable claim that their modifications were mishandled

3    and they were harmed.  But there is no evidence that *all* of them do.  Rather, the data cited in Dr.

4    Skanderson's report show the opposite.

5        A similar defect doomed class certification in *Burton v. Nationstar Mortg., LLC*, 2014 WL

6    5035163 (E.D. Cal. Oct. 8, 2014), *report and recommendation adopted*, 2014 WL 5528140 (E.D.

7    Cal. Oct. 31, 2014).  The plaintiff there alleged that Nationstar had a practice of offering

8    borrowers permanent loan modifications with effective dates before the offers were even mailed—

9    thus, the plaintiff argued that every borrower who signed and returned a modification agreement

10   "experienced some delay in the booking of their modifications."  *See Burton*, 2014 WL 5035163,

11   at *5-7.  Nationstar pointed out, however, that modifications are implemented retroactively to the

12   contractual effective date regardless of when they are actually implemented, just as Bank of

13   America does here.  *Id.* at *7-8; Ex. 2 at 52:1-4.  As a result, the Court agreed with Nationstar that

14   there was "no evidence the absent class members who received loan modifications booked by

15   Nationstar suffered the damages presumed by Plaintiff in his motion for class certification," and

16   thus many borrowers in the class had no constitutional injury-in-fact.  *Burton*, 2014 WL 5035163,

17   at *7-8.

18       The grounds for Plaintiffs' motion for class certification here are the same as in *Burton*.

19   Plaintiffs complain that there is always a delay between a borrower's return of the modification

20   documents and the modification's closing in Bank of America's systems.  Mot. at 6.  Plaintiffs say

21   that the delay ████████████████     but can be "much longer" in "actual practice"

22   because the implementation for the Plaintiffs "took at least eight months."  *Id.*  Of course, the

23   allegation that there was a delay of eight months for Plaintiffs, and "████████" for some other

24   unspecified, hypothetical borrowers, is not evidence that there was an objectionable delay, and a

25   resulting injury, for *every* borrower who returned an FHA HAMP modification agreement.  The

26   data and other evidence in the record show otherwise: ███████████████████

27   ████████████████████████████████████████████████

28

1  ███████████████████████████████████████████████████. Ex. 1 ¶¶ 13-15; Ex. 2 at

2  51:23-52:4.

3       Nor is there evidence that every borrower experienced "adverse credit reporting" or any of

4  the other forms of injuries claimed by Plaintiff.  Opp. at 2; *see Burton*, 2014 WL 5035163, at *8

5  (no Article III standing where claim that "absent class members suffered damages because a delay

6  impacts the borrower's credit rating" was "unsupported by evidence").  For one thing, there is no

7  evidence that *Plaintiffs themselves* experienced this injury.  To the contrary, ███████████████

8  ████████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████████████████. Ex. 1

11 ¶¶ 23-38.  But even if Plaintiffs had suffered credit-related harm, they have no basis on which to

12 extrapolate that harm to the entire putative class.  █████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████████████

15 ██████████████   *See* Decl. of Sandra Evans in Support of Bank of America's Opp. to Pls.' Mot.

16 for Class Certification; Ex. 1 ¶¶ 39-45.

17       In sum, the class that Plaintiffs seek to certify is so overly broad that it includes borrowers

18 with no injury at all (and therefore no standing).  And even if Plaintiffs could cite evidence to the

19 Court showing that other class members might arguably have some injury (which Plaintiffs have

20 not done), the alleged injury suffered by Plaintiffs would not be typical of the injury suffered by

21 other members of the putative, overly broad class.

22   **B.  An Overbroad Class Violates Rule 23's Ascertainability Requirement.**

23       To be certifiable, a class must be "ascertainable," *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567

24 (N.D. Cal. 2009), "meaning that the class definition must be 'definite enough so that it is

25 administratively feasible for the court to ascertain whether an individual is a member.'" *Tijero v.

26 Aaron Bros., Inc.*, 2013 WL 60464, at *4 (N.D. Cal. Jan. 2, 2013); *see also Williams v. Oberon

27 Media, Inc.*, 468 F. App'x 768, 770 (9th Cir. 2012) (plaintiffs must "establish an objective way of

28 determining" class membership).  But a class does not satisfy the ascertainability requirement if it

-12-

is defined so broadly that it "includes those who have not been harmed."  *In re Autozone, Inc.*, 289 F.R.D. 526, 546 (N.D. Cal. 2012); *accord Mazur*, 257 F.R.D. at 567; *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1152 (N.D. Cal. 2010).  That's because it's *easy* to propose a class definition that is "objective" and "definite" only because it is wildly overbroad: ascertaining the group of people who signed and returned FHA-HAMP modification agreements sounds feasible, but ascertaining which of those people experienced some kind of harm in common with what Plaintiffs allege about their own experience is another matter altogether.

*Mazur* is a classic example of this problem.  The plaintiffs there brought suit against eBay on the grounds that certain sellers were engaging in phony "shill" bidding to inflate prices, and sought to certify a class of "all persons in the United States who won auctions" from those sellers. 257 F.R.D. at 564, 567.  The Court found the class definition fatally inadequate because there was no evidence that *every* auction winner was "harmed because of an inflated price."  *Id.* at 567. "Because the class as currently defined would include these non-harmed auction winners," the Court ruled, "the class definition is both imprecise and overbroad," while a class defined to include only those who were injured by the alleged shill bidding was "wholly unascertainable." *Id.* The same holds true here.  The class that Plaintiffs propose cannot be certified because it contains many borrowers who have not been harmed.  And Plaintiffs have identified no method at all for ascertaining which borrowers were harmed by the allegedly actionable conduct of Bank of America in processing their loan modifications.

## II.  THERE IS NO COMMON QUESTION OF LAW OR FACT.

A party moving for class certification carries the burden of identifying "a common contention . . . that [] is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551.  The "contention" Plaintiffs make here is that "each of the Class members entered into a contract for a loan modification with Bank of America pursuant to California law and yet, in credit reporting and collection, Bank of America continued to treat them as if they had not."  Mot. at 9.  Neither component of this question is capable of classwide resolution "in one stroke."

Indeed, numerous courts have denied class certification in cases where plaintiffs not only asserted the same *claims* Plaintiffs seek to certify here, but made the very same *arguments* in seeking class certification.  Although Plaintiffs have defined their class more narrowly than the classes proposed in these cases (in an apparent attempt to evade their application), it is not narrower in a sense that makes any difference to the outcome.  In each of these precedent cases, courts have found the requirements of Rule 23 unsatisfied because it is impossible to hold a loan servicer liable for failing to implement a loan modification without determining that the borrower was entitled to a loan modification in the first place—and plaintiffs have consistently failed to show that there is any way of doing this threshold inquiry without individualized evidence on (among other things) what the specific agreements at issue provided, what conditions were attached, and whether those conditions were satisfied.  Instead, plaintiffs in each of these cases have tried various creative ways to shortcut that individualized inquiry, only for courts repeatedly to hold that there is no shortcut.  The theory Plaintiffs rely on in the instant motion is yet another attempt at a shortcut around an unavoidable individualized analysis—and it doesn't work.  Their motion should therefore be denied for the same reasons courts have denied certification in similar cases.

**A.  Plaintiffs Do Not Identify Common Issues Capable of Classwide Resolution.**

Plaintiffs introduce their brief by making two contentions they claim are "[c]ommon to the plaintiffs' claims, and to the class."  Mot. at 1.  First, they claim that the permanent modification agreements Bank of America offered to the putative class were "uniform," that every agreement was "the same."  *Id.* at 1-2.  Second, they accuse Bank of America of "systematic" breaches of contract as a result of uniform "policies and procedures."  *Id.* at 1.  Courts have repeatedly rejected *both* of these contentions as a purported basis for finding the requirements of Rule 23 satisfied in prior loan-modification cases against Bank of America (and other loan servicers).

**1.  Allegedly "Uniform" Contracts Do Not Create Commonality.**

In *Campusano*, eleven plaintiffs sought class treatment of claims asserting "that they entered into agreements with BOA to modify the terms of the[ir] mortgage loans" and that "BOA breached these loan agreements by failing to timely implement" the modifications.  2013 WL

2302676 at *1-2.  Like the Plaintiffs here, the *Campusano* plaintiffs argued that commonality was present because the loan-modification agreements were "form contracts" with "uniform" provisions.  *Id.* at *5-6.

The Court found no evidence that the contracts *were*, in fact, uniform—but held that it didn't matter, because the question the Court would have to resolve for every plaintiff did not turn on the "interpretation" of the contracts but on facts about the parties' actual course of dealings.  *Id.* Specifically, the Court reasoned:

> [T]he mere construction of a[] [contractual] provision would not solve a critical disputed issue in this case.  Rather, it would lead to a host of individual questions regarding the underlying validity of the loan modification agreements: Did both parties agree to this contract? Did this contract require fulfillment of conditions precedent? Were those conditions fulfilled in this instance? Thus, even if Plaintiffs could show that the allegedly uniform . . . terms were in fact present in all loan modification agreements signed by class members, those terms would not suffice as a common question . . . .

*Id.* at 6.  In other words, while "uniform" contractual provisions may sometimes support commonality where the entire case turns on what one of the uniform provisions *means*, there is no common issue where each borrower's case turns on whether the parties in fact entered into the agreement and satisfied the conditions set forth in it, whether those conditions are uniform or not.

While *Campusano* covered multiple loan-modification programs and Plaintiffs here limit their putative class to FHA-HAMP, that limitation does not mean that the subject agreements are uniform (or that commonality would exist even if they were).  The discovery record shows a number of material terms that appear in some loan-modification agreements but not in others, even within the universe of FHA-HAMP agreements.  For example:

- Some of the agreements provide that "[t]he Loan Documents will not be modified unless and until (1) Lender approves this Agreement and (2) the Modification Effective Date . . . has occurred." *E.g.*, Ex. 15 at 687060.  Other agreements, in contrast, omit the first condition and merely provide that "[t]he Loan Documents will not be modified unless the Modification Effective Date . . . has occurred." *E.g.*, Ex. 16 at 668473.

- Some of the agreements provide that "[t]he Loan Documents will not be modified unless and until the modification is approved by the Bankruptcy Court in my bankruptcy case." *E.g.*, Ex. 15 at 687061.  Relatedly, while most of the agreements

provide that the loan will be modified one month after a "Modification Effective Date"
set forth in the agreement (*e.g.*, Ex. 16 at 668473-74), some of the agreements redefine
the "Modification Effective Date" as "the date on which the Bankruptcy Court
approves the modification in my bankruptcy case." *E.g.*, Ex. 15 at 687061.

- Some but not all of the agreements require the borrower to obtain flood insurance as a
  condition of the modification.  *E.g.*, Ex. 14 at 677149.

- Some but not all of the agreements require the borrower to warrant that "[t]he property
  currently has no materially adverse physical condition(s)." *E.g.*, Ex. 15 at 687060.

- Some but not all of the agreements require the borrower to warrant that "I do not have
  any other FHA-insured mortgage." *Id.*

- Some but not all of the agreements require the borrower to warrant that "I currently
  have sufficient income to support the financial obligations under the Loan Documents,
  as modified by this Agreement." *Id.*

Just as significantly, while there are other terms that do appear in more-or-less the same form in
each FHA HAMP modification offer and agreement, these include a number of additional
conditions that bear on whether a valid modification agreement exists and, if so, what the parties'
obligations are thereunder.  For example, the offer and agreement exhibited by Plaintiffs provide
the following:

- "If you want to accept this Commitment, you must sign as indicated below and deliver
  the signed Commitment to Bank of America, N.A. at the address listed below, by
  March 16, 2012, along with the other documents described in and included with this
  Commitment.  Failure to do so will result in the automatic withdrawal by Bank of
  America, N.A. of this Commitment without further notice.  **Important Note**: All
  borrowers, guarantors, endorsers or sureties on the original Mortgage must sign the
  Modified Mortgage and any other documents that we require.  Any co-owner who was
  not a borrower on the original loan must sign the Modified Mortgage to consent to the
  modification. . . ." Zinner Decl. Ex. 1 at 669.

- "This Commitment is contingent on the following: (i) your execution and return of the
  Partial Claim and Modification documents included in this FHA-HAMP package; (ii)
  your continuing qualification for the FHA-HAMP program and (iii) Bank of America,
  N.A.'s verification that the title to the subject property is free from any defect,
  encumbrance, unauthorized conveyance or any other irregularity.  A title search of the
  subject property will be initiated by Bank of America, N.A. upon your return of the
  executed Commitment, Partial Claim documents, and the Modification Agreement.  In
  the event the title search, or any other information, indicates any title irregularity,
  including but not limited to any unauthorized conveyance, or any superior or
  subordinate lien(s), whether voluntary or involuntary, the Commitment and its terms

-16-

shall not be effective, binding, or enforceable against Bank of America, N.A. . . ." *Id.* at 672.

- "We [the borrowers] acknowledge that this Commitment is subject to the fulfillment of all contingencies as provided in Section D of the Commitment. Bank of America, N.A. shall determine whether the contingencies have been satisfied." *Id.* at 673.

- "All representations made by us [the borrowers] pursuant to the Program and the Commitment are true and correct and have been and will be relied upon to Bank of America, N.A., and any breach of the representations will give Bank of America, N.A. the right to terminate this Commitment. . . ." *Id.*

- "I certify, represent to Lender and agree: A. I am experiencing a financial hardship, and as a result . . . I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments due under the Loan Documents now or in the near future; B. I live in the Property as my principal residence, and the Property has not been condemned; C. There has been no change in the ownership of the Property since I signed the Loan Documents; D; I have provided documentation for **all** income that I receive . . . ; E. Under penalty of perjury, that all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct; and F. I have made all payments required under a trial period plan, as required under the Program." *Id.* Ex. 2 at 675.

- "I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordinate agreement(s) that are necessary or required by the Lender's procedures and/or the Program to ensure that the Mortgage, as modified by this Agreement, is in first-priority lien position and is fully enforceable. I further acknowledge and agree that the terms of this Agreement will not become effective and the Agreement will be null and void if the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s) on or prior to the Modification Effective Date." *Id.* at 677-678.

- "I will execute such other documents as may be reasonably necessary to: (i) consummate the terms and conditions of this Agreement; and/or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement (a 'Corrected Agreement'). I understand that if a Corrected Agreement is provided to me, this Agreement will be void and of no legal effect. If I elect not to sign a Corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Program." *Id.* at 678.

- "The Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement." *Id.* at 675-676.

Determining whether any given borrower has a valid loan-modification agreement with Bank of America, and whether it has an obligation under that agreement to modify the borrower's loan, cannot be decided without determining whether each of these conditions has been satisfied. And, as the Central District ruled in *Campusano*, the contention that the agreements are uniform, or similar, or that they have some terms in common, is not a substitute for the individualized evidence necessary to determine whether each condition (uniform or not) was satisfied.

-17-

1    *Campusano* is not the only court to have reached this result.  For example, in denying

2    certification of a putative class action against another loan servicer, the District Court in *Glover v.*

3    *Udren*, 2013 U.S. Dist. LEXIS 170246 (W.D. Pa. July 18, 2013), reasoned:

4           Even assuming that Plaintiff could show that every class member entered into identical
           loan modification agreements, it would require an individualized analysis to determine
5           breach and damages.  The Court would need to scrutinize every class member's mortgage
           transaction history to determine if they made a payment, whether that payment was applied
6           correctly in accordance with the terms of the agreement and the individual damages that the
           class member is permitted to recover based on the misapplication.
7

8    *Id.* at *55-57; *see also id.* at *37-38.  The same individualized inquiry defeated class certification

9    in *In re Bank of Am. HAMP Contract Litig.*, 2013 WL 4759649 (D. Mass. Sept. 4, 2013).  In that

10   case, the plaintiffs accused Bank of America of breaching HAMP trial modification agreements by

11   failing to offer borrowers permanent loan modifications, but the Court's reasons for finding this

12   question unsuitable for classwide adjudication are just as applicable here, where Plaintiffs allege a

13   breach of a permanent modification agreement.  As the Court noted, "[i]n order to show that Bank

14   of America is liable for a breach of contract, each plaintiff must show that a contract existed, that

15   he performed as required by that contract, and that Bank of America breached the contract."  *Id.* at

16   *10.  Determining that each borrower "performed as required" is not a determination that can be

17   made simply by reference to contract terms (even uniform contract terms), but requires

18   individualized evidence as to whether each borrower "provide[d] accurate documents," "live[d] in

19   the property as his principal residence," "[a]nd so on, and so on, and so on, for each obligation of

20   each [class] member."  *Id.*  Some of the same conditions are present in the modification

21   agreements at issue here (and other conditions besides), and there is simply no way for Plaintiffs

22   to avoid the necessary examination of individual evidence and establish that *every* putative class

23   member satisfied every condition "in one stroke," with common evidence.

24       **2.  Purported "Systematic" Policies Do Not Create Commonality.**

25          Plaintiffs accuse Bank of America of following "systematic" "policies and procedures"

26   that "dictated that its mortgage servicing management system . . . would not be updated to reflect

27   the modifications until *after* it completed a lengthy internal process."  Mot. at 1.  This is basically a

28   tautology—an allegation that Bank of America does not modify a loan until it modifies a loan.  It

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                              Case No. 2:12-CV-02502-GEB-KJN

is also exactly the same theory that the *Campusano* plaintiffs asserted—unsuccessfully.  In

*Campusano*, the plaintiffs complained of alleged "uniform policies . . . to delay or entirely fail to

implement the terms of [a] modification agreement[]" until it has passed an internal "validation or

quality control process." 2013 WL 2302676 at *1.  But, as *Campusano* ruled, merely claiming that

such a process exists is not enough to establish liability to every class member in "one stroke" (or,

for that matter, even to a single class member).

In *Wal-Mart*, the Supreme Court established that uniform policies are only relevant to class

certification if those policies *are* the illegal conduct—for example, a company "policy of

discrimination" can establish commonality in a discrimination case, because such a policy

"bridg[es] the gap" between an individual claim and a claim on behalf of others.  131 S. Ct. at

2553.  But claiming that Bank of America follows an "internal process" for processing loan

modifications does *not* bridge the gap.  As *Campusano* ruled:

> Plaintiffs also assert, with little explanation, that BOA's "uniform systemic practices"
> fulfill the commonality requirement.  However, the mere existence of BOA's quality
> control, validation, and [other] procedures—whatever their objective—did not violate the
> terms of any loan modification agreement.  Notably, Plaintiffs have not submitted any
> evidence of even a single case in which these processes led the bank to charge a borrower
> late fees or take some other action in breach of a loan modification agreement.  In other
> words, there is no evidence to suggest that all or even any of the putative class members
> suffered harm as a result of these processes or policies.

2013 WL 2302676, at *7 (citing *Wal-Mart*).  The same holds true here.  The "mere existence" of

an "internal process" for updating loan terms does not violate the terms of any loan modification

agreement.

Plaintiffs claim, for example, that they were injured because the ███████████████

██████████ . . . took at least eight months" for them, ████████████████████████████

Mot. at 6.  In other words, Plaintiffs do not allege they were injured by a uniform policy—they

allege they were injured by a *deviation* from the usual policy.  In either event, there is no "link"

between the policy and "the alleged harms suffered by the class" (or by the Plaintiffs individually).

*Campusano*, 2013 WL 2302676, at *7.  The content of an internal Bank of America policy to

review loan modification papers for compliance with all requirements is simply irrelevant to

whether the eight months it allegedly took to close Plaintiffs' modification breached a contract

-19-

1   with them—either it was a breach or it wasn't, regardless what the Bank's policies were.  The

2   content of the policy is equally irrelevant to determining how long the closing process took for

3   other borrowers, and whether *those* spans of time breached agreements with *those* borrowers.  The

4   showing Plaintiffs would have to make to establish that Bank of America breached their

5   modification agreement ███████████████████████████████ would not establish

6   that Bank of America breached the agreements made with ████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████ all of whom are

9   asserted to belong to the putative class despite having no discernible cause for complaint (or, at the

10  absolute least, no discernible cause for complaint in any way similar to Plaintiffs').  Ex. 1 ¶ 15.

11       Plaintiffs' argument is also defective for a more fundamental reason, which was addressed

12  at length in yet another class-certification denial in the loan-modification context, *Parker v. Bank

13  of Am., N.A.*, 2015 WL 1737278 (D.D.C. Apr. 16, 2015).  The plaintiff in that case *also* relied on

14  the same "uniform and systematic policies" theory that Plaintiffs rely on here.  *Id.* at *1.

15  Specifically, the plaintiff there alleged that "although he was making prompt payments in

16  accordance with the modification agreement, BOA did not acknowledge his payments as being

17  made in satisfaction of the modified mortgage agreement and was simultaneously filing credit

18  reports that falsely stated that Parker was behind on his mortgage payments." *Id.* at *5.  This is the

19  same theory asserted by Plaintiffs here—that ██████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████ Mot. at 6-7.  The *Parker* plaintiff attributed the Bank's

24  alleged failure to close his loan modification to a "uniform procedur[e]" he called the "post-

25  modification review process." 2015 WL 1737278, at *4-5.  While his account of this purported

26  "process" was much more detailed than Plaintiffs' vague description here of the ████████

27  ████████████████ (Mot. at 6), both boil down to the same complaint: that the Bank did

28  not implement modifications immediately when borrowers signed and returned them because the

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                              Case No. 2:12-CV-02502-GEB-KJN

1   Bank had to go through some other process before the modifications could be closed in the

2   system.

3          A key observation made by the District Court in *Parker* was that even if the plaintiff's

4   account of this process were true, there was no indication that the process "occurs *after* valid and

5   binding modification agreements have been reached." 2015 WL 1737278, at *15 (emphasis in

6   original).  Plaintiffs' theory in this case suffers from the same defect.  Plaintiffs complain about

7   ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████         Mot. at 6.  For this to amount to a breach

10  of contract, however, it would have to be true that (i) a valid and binding contract is in place as

11  soon as "the vendor notifies Bank of America that a borrower has returned all of the documents,"

12  and (ii) this contract obligates Bank of America to modify the loans immediately.  *Id.* As the

13  actual contractual terms (and basic principles of contract law) demonstrate, however, neither

14  proposition is true.  There are a number of conditions borrowers must satisfy to have a binding

15  contract for a modification beyond merely "return[ing] all of the documents."  *See supra* Part

16  II.A.1.  Thus, the process Plaintiffs complain of does not amount to a breach of contract on a

17  uniform basis (or otherwise) because a process that "occurs when a borrower returns the

18  modification agreement" occurs "*prior* to contract formation."  *Parker*, 2015 WL 1737278, at *15

19  (emphasis added).  This defect in Plaintiffs' theory is explored in further detail in Part II.B.1,

20  below.

21       **B.  The Class Definition Offers No Shortcut Around the Individualized Inquiries.**

22          Plaintiffs' class definition appears to be a deliberate attempt to sidestep the individualized

23  questions that persist even if their contentions about "uniform" contracts and "uniform" policies

24  are taken at face value.  That definition has two components: (i) the borrower "signed and returned

25  Bank of America's offer of a permanent FHA HAMP modification," and (ii) "Bank of America

26  recorded a lien in favor of the Secretary of Housing and Urban Development pursuant to that

27  modification." Mot. at 7.  Plaintiffs follow this definition with a commonality argument that

28  occupies all of three pages, in which they try to make the case that any borrower who returned an

-21-

1    agreement and had a HUD lien recorded has necessarily passed the threshold of contract formation

2    and satisfied all of the conditions for receiving a modification.  But neither argument holds water.

3           **1.   Not Every "Signed and Returned" Agreement is a Valid One.**

4          Plaintiffs argue that the mere fact that each borrower signed and returned a loan

5    modification agreement means that a valid contract for a loan modification has been formed.  Mot.

6    at 9-10.  Plaintiffs do not base this argument on the contractual language itself, but on a

7    rudimentary summary of the contract-law principles of offer-and-acceptance.  Under Plaintiffs'

8    theory, Bank of America offered a loan modification, Plaintiffs accepted that offer by signing and

9    returning the document, and that is the end of the contract-formation inquiry.  *See id.*

10         In truth, that is just the *beginning* of the inquiry.  As Plaintiffs recognize, the manner of

11   acceptance "may be specified in the offer, in which case no other will suffice."  *Id.* at 10 (quoting

12   1 B. WITKIN, SUMMARY OF CALIFORNIA LAW, CONTRACTS § 189 (10th ed. 2002)).  Here, even

13   assuming (as Plaintiffs argue) that the documents Bank of America sent to the Plaintiffs are

14   properly categorized as an "offer," that offer specified that borrowers must not only sign and

15   return the agreement, but do so by a specified date, "along with . . . other documents" and the

16   signatures of any other "co-owner[s,] . . . borrowers, guarantors, endorsers or sureties on the

17   original Mortgage."  Zinner Decl. Ex. 1 at 669.  And even if it were assumed that every borrower

18   who signed and returned an agreement did so in accordance with these requirements (and it cannot

19   be assumed—Plaintiffs must affirmatively prove it), that is still not enough to form a contract.

20   Plaintiffs omit one of the most fundamental requirements: the bank's counter-signature.

21         It is beyond any doubt that loan-modification agreements are subject to the California

22   statute of frauds.  "A mortgage can be created . . . only by writing," Cal. Civ. Code § 2922, and

23   "[a] contract in writing may be modified by a contract in writing."  *Id.* § 1698(a).  Thus, "[a]n

24   agreement to modify a contract that is subject to the statute of frauds is also subject to the statute

25   of frauds."  *Khan v. CitiMortgage, Inc.*, 975 F. Supp. 2d 1127, 1137 (E.D. Cal. 2013) (citing

26   *Secrest v. Sec. Nat'l Mortg. Loan Trust 2002-2*, 167 Cal. App. 4th 544, 553 (2008)); *accord, e.g.*,

27   *Justo v. Indymac Bancorp*, 2010 WL 623715, at *7 (C.D. Cal. Feb. 19, 2010) ("a modification of a

28   mortgage is subject to the statute of frauds").  Contracts subject to the statute of frauds "are

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                Case No. 2:12-CV-02502-GEB-KJN

invalid, unless they . . . are in writing and subscribed by the party to be charged."  Cal. Civ. Code § 1624(a); *see also Khan*, 975 F. Supp. 2d at 1137 (quoting same).  Thus, it is not enough for borrowers to sign and return a loan-modification agreement to form a contract.  The Bank must also sign it.  Any "process" the Bank undertakes *prior* to signing the agreement, as the Court in *Parker* ruled, takes place "prior to contract formation." 2015 WL 1737278, at *15.

Further, even if a contract *is* formed in a particular case, the nature of the parties' obligations under the contract (and any alleged breach) must still be established.  To cite just one of the numerous applicable conditions, Plaintiffs' modification agreement specifically sets forth that Bank of America will conduct a "title search of the subject property" *after* Plaintiffs' "return of the executed . . . Agreement," and if this title search "indicates any title irregularity," the modification "shall not be effective," and Bank of America "will not be obligated or bound to make any modification of the Loan Documents."  Zinner Decl. Ex. 1 at 672; *id.* Ex. 2 at 675-76. Simply determining that a borrower "signed and returned" a modification agreement (Mot. at 7) does not answer the question whether the property passed the title search.  And, because "a class cannot be certified on the premise that [Bank of America] will not be entitled to litigate its . . . defenses to individual claims" (*Wal-Mart*, 131 S. Ct. at 2561), Bank of America would have every right to present individualized evidence as to every class member that failed the title search or failed to satisfy any of the other conditions set forth in their particular agreements.  This destroys commonality.  *See id.*

### 2.  Recording the HUD Lien Does Not Waive Contractual Conditions.

The second limitation Plaintiffs build into their class definition is their most direct attempt to brush aside the above contingencies.  Plaintiffs argue that "[t]he recordation of HUD liens establishes that all members of the Class either met both the FHA-HAMP and title contingencies, or the bank waived them." Mot. at 11.  Plaintiffs make this argument with no citations of any kind as though the principle were self-evident, but it does not actually stand up to scrutiny.

Recordation of liens under the FHA-HAMP program is governed by a specific regulatory scheme.  Under that scheme, HUD "requires that the partial claim security instruments be submitted for recordation to the appropriate jurisdiction within a maximum period of five (5)

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

1    business days following the execution AND prior to filing a claim with HUD." ML 2003-19 at 6

2    (RJN Ex. L); *see also* ML 2009-23 Att. at 3 (RJN Ex. B) (making "the requirements of Mortgagee

3    Letter[] . . . 2003-19" applicable to FHA-HAMP).  HUD's Frequently Asked Questions (FAQ)

4    page on the FHA-HAMP partial claim process specifies that the "recordation process involves the

5    following three stages: (1) Execution of documents by Borrower . . . , (2) Lender receives the

6    executed documents from the Borrower, (3) Upon completion of steps 1 and 2, the above-

7    referenced five-business-day recordation requirement begins to toll." HUD, Partial Claim FAQ

8    (RJN Ex. M).

9         Nowhere in this guidance does HUD intimate at any requirement that the servicer complete

10   its determination of the borrower's eligibility for the permanent modification within this five-day

11   period, nor is there any reason why the servicer *would* be obligated to do so.  For example, if a

12   servicer cannot implement a modification because the borrower signed and returned the agreement

13   without obtaining the signature of "[a]ny co-owner" or other "borrowers, guarantors, endorsers or

14   sureties on the original Mortgage" (Zinner Decl. Ex. 1 at 669), five business days is unlikely to be

15   enough time for (i) the servicer to make contact with the borrower, (ii) the servicer to send out

16   new papers to sign, (iii) the borrower to collect the necessary signatures (and have them

17   notarized), and (iv) the borrower to return those papers to the servicer.  That is not a problem,

18   however, because the HUD guidance simply directs the servicer to record the lien and it can

19   remedy the issue preventing the modification from closing afterwards.  Plainly, following HUD's

20   recording rules cannot possibly mean that all borrowers "met" all necessary contingencies in every

21   case.  Mot. at 11.

22        Nor is there any basis in the law for Plaintiffs' contention that following HUD's recording

23   rules operated as a "waive[r]" of the condition.  *Id.*  Plaintiffs base this contention on the *ipse dixit*

24   statement that if a borrower failed to satisfy any conditions, "Bank of America would have had no

25   basis for recording a lien against the borrower's title."  Mot. at 11.  The problem with this theory

26   is that it assumes that recording the lien is an act that has legal significance in carrying out the

27   terms of the modification agreement.  But well-established principles of property law make clear

28   that it has *no* legal significance or any effect whatsoever on the rights or obligations of the parties.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                           Case No. 2:12-CV-02502-GEB-KJN

The sole effect of recording an instrument is to "provide[] 'constructive notice' of the contents of the recorded documents to third parties." *Wells Fargo Bank, N.A. v. Boutris*, 265 F. Supp. 2d 1162, 1175 (E.D. Cal. 2003).  It has no effect at all on the relative rights and obligations of the parties to the instrument.  An unrecorded instrument remains binding as between the parties, and the fact that an instrument is recorded does not mean that it is valid or binding.  *See, e.g.*, Cal. Civ. Code § 1217 ("An unrecorded instrument is valid as between the parties"); *Domarad v. Fisher & Burke, Inc.*, 270 Cal. App. 2d 543, 554 (1969) (instruments recordable "whether valid or invalid"). Seen in this light, HUD's purpose in imposing the 5-day recordation requirement is obviously to ensure that the lien does not lose its priority in "race notice" jurisdictions like California, and it neither assumes nor mandates that the entire modification process closes in 5 days (else it would not have simultaneously specified that the recording be done "prior to filing [the] claim with HUD").  ML 2003-19 at 6, *supra* (RJN Ex. L).

Nor does the law pertaining to waiver support Plaintiffs' theory even if the specifics of the recording-law scheme and the HUD guidance are taken out of the equation.  The doctrine of waiver "is restricted to conditions that are relatively minor."  2 FARNSWORTH ON CONTRACTS § 8.6 at 453 (2d ed. 1990) (citing RESTATEMENT (SECOND) OF CONTRACTS § 84(1) (condition must not be "a material part of the agreed exchange for the performance of the duty")); *see also, e.g.*, JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 11-31, at 493 (3rd ed. 1987) ("The most important rule is that waiver of a material part of the agreed exchange is ineffective."). The conditions that Plaintiffs seek to waive here are highly material parts of the agreement between the parties—such as the condition that the borrowers' representations that they qualify for FHA-HAMP in the first place are true and correct, the condition that the agreement was returned on time, or the condition that the modification be approved by the lender or by a bankruptcy court.

Furthermore, for a condition to be waived, the intent to waive it "must be unequivocal, and be treated and acted upon as such" by the other party.  *Monson v. Fischer*, 118 Cal. App. 503, 520 (1931); *see also, e.g.*, *Jackson v. Fannie Mae*, 2012 U.S. Dist. LEXIS 41885, at *16 (D. Or. Mar. 26, 2012) (rejecting loan-modification plaintiff's argument that Bank of America waived a deadline condition because "a waiver must be unequivocal").  Aside from the fact that there is

-25-

1  nothing "unequivocal" about the alleged waiver here, the principle that waiver is only effective if

2  "acted upon" by the other party destroys commonality even if *some* borrowers were capable of

3  prevailing on the argument.  Because a party must "show reliance" to prevail on a waiver

4  argument, the waiver analysis can only be "performed on an individualized, case-by-case basis,"

5  as the reliance determination "is particular to each and every individual." *Chesner v. Stewart Title*

6  *Guar. Co.*, 2009 U.S. Dist. LEXIS 22453, at *29-36 (N.D. Ohio Jan. 9, 2009) (denying class

7  certification because waiver argument requires "detailed factual inquiries into the circumstances of

8  each and every transaction"); *Randleman v. Fid. Nat'l Title Ins.*, 264 F.R.D. 298, 305-06 (N.D.

9  Ohio 2009) (same); *accord* 30 CAL. JUR. 3D, ESTOPPEL & WAIVER § 24 (waiver only where party

10 "justifiably led the other party to believe that he has waived the right").  Another reason it is

11 impossible to resolve the waiver issue for the entire class "in one stroke" is that waiver is an

12 "equitable doctrine," *Donicker Corp. v. Pittsburgh Nat'l Bank*, 1994 U.S. App. LEXIS 31528, at

13 *15 (9th Cir. 1994), and thus subject to equitable defenses specific to each borrower's

14 circumstances (such as unclean hands).

15      Finally, Plaintiffs' waiver argument only references *contractual* conditions.  Even if

16 Plaintiffs' theory as to those conditions were valid (and it isn't), Plaintiffs do not even mention

17 *legal* requirements like the statute of frauds, and therefore offer no theory at all on how this

18 essential legal requirement disappears by virtue of the act of recording a lien.  As loan-

19 modification agreements are clearly governed by the statute of frauds (*see supra* Part II.B.1), in

20 order to establish that the statute of frauds does not apply, Plaintiffs would need to establish that

21 an *exception* to the statute of frauds applies.  Since Plaintiffs do not mention the statute of frauds

22 even once in their brief, they are naturally silent on what exception that might be, but their

23 argument appears to be geared towards suggesting that recording the lien constitutes a "partial

24 performance" of a loan-modification agreement that justifies enforcing the agreement, even if not

25 signed by both parties.  If this is indeed Plaintiffs' theory, it does not help them, because the

26 partial-performance doctrine also has a reliance element, and "the party seeking to enforce the

27 contract must have changed position in reliance on the [unsigned] contract to such an extent that

28 application of the statute of frauds would result in an unjust or unconscionable loss, amounting in

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    Case No. 2:12-CV-02502-GEB-KJN

1   effect to a fraud." *Chanthavong v. Aurora Loan Servs., Inc.*, 2011 WL 6012353, at *7 (E.D. Cal.

2   Dec. 1, 2011); *accord*, *e.g.*, *Krouse v. BAC Home Loans Servicing, LP*, 2011 WL 6100406, at *4-5

3   (E.D. Cal. Dec. 6, 2011).  Perhaps Plaintiffs can find *some* putative class members who "changed

4   position in reliance" on Bank of America's recording of the lien.  But Plaintiffs cannot show in

5   one stroke that *all* class members did so.  Indeed, Plaintiffs cannot even show that they *themselves*

6   did so.  Both of them admitted to having no knowledge whatsoever of the lien recordation, and

7   thus cannot possibly have changed position in reliance on it.  Ex. 8 at 142:23-143:3 ("Q. Did you

8   know your lien was recorded at the time that Bank of America had it recorded? A.  No, because it

9   wasn't until now that I understood it was a lien.  Q. Until 2015? A.  Yes.").

10   **III.  PLAINTIFFS FAIL TO SATISFY THE OTHER REQUIREMENTS OF RULE 23.**

11          **A.  Plaintiffs Do Not Show They Are Typical of the Purported Class.**

12          "The test of typicality is whether other members have the same or similar injury [as the

13   named plaintiffs], whether the action is based on conduct which is not unique to the named

14   plaintiffs, and whether other class members have been injured by the same course of conduct."

15   *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011).  Typicality is not present

16   "where a putative class representative is subject to unique defenses which threaten to become the

17   focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

18          Plaintiffs' typicality argument is a single sentence in which they state that they "bring the

19   same legal claims that other class members could bring."  Mot. at 12.  That would not be enough

20   to establish typicality even if it were true, but it is not true.  As shown above, Plaintiffs' claim

21   depends on their ability to prove that they formed a contract, performed under that contract

22   themselves, satisfied all the conditions precedent to a modification, and nevertheless were harmed

23   by a delay in implementing the modification.  The record already shows that this is not true of

24   every member of the putative class (█████████████████████; Ex. 1 ¶ 15),

25   defeating typicality.  *See Burton*, 2014 WL 5035163, at *11 ("Where some of the class members

26   have not suffered any injury, yet the class representative has been injured, the typicality

27   requirement of Rule 23(a) is not satisfied.").

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    Case No. 2:12-CV-02502-GEB-KJN

1    And the inquiry necessary to determine whether this is true for the Plaintiffs themselves is

2    different from the inquiry necessary to determine it for others.  Where, as here, the class definition

3    is "not limited to those borrowers who failed to receive a loan modification for the same reasons

4    as Plaintiff, . . . the class members' claims do not all arise from the same course of events, and

5    Plaintiff's claims are not typical of those of the class."  *Ballard v. Bank of Am., N.A.*, 2013 WL

6    4807193, at *5 (C.D. Cal. Sept. 6, 2013).  Whether Plaintiffs can prove their claim depends on

7    whether their delay in properly executing the modification documents violated the conditions of

8    the modification, such that Bank of America was not contractually obligated to modify their loan

9    until the issues were resolved.  *See* Ex. 7 at 147, 214, 232, 238, 240-42; Ex. 9 at ESQ1322; Ex. 18;

10   Ex. 19.  Even if that inquiry were to be resolved in Plaintiffs' favor, it is not relevant to resolving

11   the claims of other borrowers, many of whom experienced no delays at all (or who may have

12   experienced delays for other reasons).  "[W]hether [this] defense[] will be successful is of no

13   matter.  The fact that plaintiffs will be subject to [unique] defenses renders their claims atypical of

14   other class members."  *Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476

15   (S.D. N.Y. 1989); *accord In re Peregrine Sys., Inc. Sec. Litig.*, 2002 WL 32769239, at *7 (S.D.

16   Cal. Oct. 11, 2002) (quoting *Landry*); *Mazur*, 257 F.R.D. at 569 ("While the court need not, and

17   does not, determine the merits of these defenses, the fact that [plaintiff] may be subject to these

18   defenses at all puts her in a different position from the rest of the putative class.").

19       Plaintiffs are also subject to the defense that they have no damages.  Plaintiffs claim they

20   were injured by "adverse credit reporting" (Mot. at 1), but the record shows that the adverse

21   reporting was rectified, and Plaintiffs do not articulate any theory of how they were harmed in the

22   few months in which the reporting occurred given that they sought no additional credit during this

23   period.  *See* Background Part C; Ex. 17; Ex. 13; Ex. 8 at 127:17-19, 132:21-24, 155:5-16; Ex. 11

24   at 93:22-95:5.  Plaintiffs also claim they were injured on the theory that they had a contract for a

25   permanent modification but were "treat[ed] . . . as if they had not" (Mot. at 9), but they do not

26   articulate how this "treat[ment]" ultimately injured them given that the late charges assessed on

27   their account were all waived.  Ex. 7 at 88-106; Ex. 5 at 452; ECF No. 35 at 2, 35-1 ¶ 6.

28

-28-

On their UCL claim, Plaintiffs seek "restitution of wrongful charges" and "injunctive relief . . . requiring that Defendants correct their accounting of the Loan" (Compl. ¶ 84), but now that Plaintiffs' loan has been modified and the late charges waived, Plaintiffs are subject to the defense that the claim is moot.  Further, UCL plaintiffs must plead, and ultimately prove, that they have lost "money or property" as a result of the alleged violation, Cal. Bus. & Prof. Code § 17204, and Plaintiffs are subject to the defense that they have no such loss and therefore lack standing. Negative credit reporting does not qualify.  *Hernandez v. Specialized Loan Servicing, LLC*, 2015 WL 1401784, at *6 n.7 (C.D. Cal. Mar. 23, 2015); *Trujillo v. First Am. Registry, Inc.*, 157 Cal. App. 4th 628, 639 (2007).  Plaintiffs base their UCL claim on an allegation that they were "injured" by the recording of the HUD subordinate lien.  Compl. ¶ 81.  But this is not an injury at all since the lien is a condition of the modification Plaintiffs received and, as noted above, the act of recording a lien does not have any effect on the rights and obligations of the parties as between themselves.

But even if Plaintiffs could establish cognizable damages on each claim, it would not make them typical of the class, because "the facts proving damages for [the] named plaintiff[s]" (if any) "will not establish damages for other purported class members." *Abbot v. Am. Elec. Power, Inc.*, 2012 WL 3260406, at *3 (S.D. W. Va. Aug. 8, 2012).  Some borrowers may claim damages similar to Plaintiffs' (whatever they are); others may need to claim them under a different theory; others may not be able to claim them at all.  A showing that Plaintiffs were harmed by the eight months it took to finalize their modification will not show that others who received their modifications much sooner were harmed.  ██████████████████████████ ████████████████████████████ Ex. 1 ¶ 15.  Whether they were harmed by this cannot be determined simply by deciding whether Plaintiffs were harmed by the highly atypical delay that they experienced.

**B. Plaintiffs Cannot Show They Are Adequate Class Representatives.**

Rule 23(a)'s adequacy-of-representation requirement is "of critical importance in determining whether a class should be certified because class members who are not named parties to the suit are bound by the judgment." *Simon v. Ashworth, Inc.*, 2007 WL 4811932, at *2 (C.D.

Cal. Sept. 28, 2007).  Plaintiffs here have raised serious questions about their adequacy by showing no understanding regarding what the case is about or what their responsibilities are as class representatives.

First, they are unaware of basic facts important to their claims such as when their loan was modified, if it was ever modified, or if there was any delay at all.  Ex. 8 at 153:21-23, 137:6-12, 115:3-4, 115:9-15, 115:19-22; Ex. 11 at 17:8-10, 22-25, 43:23-44:1, 12:24-13:1.  They "don't know" what they have sued Bank of America for, what the lawsuit is about, what claims they have asserted, or what they meant when they alleged in their complaint that Bank of America is treating their loan as defaulted.  Ex. 8 at 11:3-4, 117:20-21, 122:12-14; Ex. 11 at 84:7-11.  "A party who is not familiar with the basic elements of his claims is not considered to be an adequate representative." *Brown v. Brewer*, 2009 WL 1574556, at *4 (C.D. Cal. May 29, 2009).

Nor do Plaintiffs understand what it means to be a class representative, saying they would have to defer to their lawyers to answer questions about their obligations or whose interests they would be responsible for protecting in the event of a settlement.  Ex. 8 at 158:19-25, 159:11-13.  This does not bespeak a representative who "will serve the necessary role of checking the otherwise unfettered discretion of counsel in prosecuting the suit."  *Arabian v. Sony Elec., Inc.*, 2007 WL 627977, at *7 (S.D. Cal. Feb. 22, 2007) (internal quotation marks, brackets, and ellipses omitted).  And insofar as a class representative's responsibilities include testifying at trial, Plaintiffs cannot manage it.  They admit that Mr. Esquivel, at least, isn't capable of serving as a class representative because of his health and memory problems, Ex. 8 at 32:2-6, 157:24-158:3; Ex. 11 at 9:9-13, 126:6-9, but the truth is that neither one has carried their burden of showing the ability to fulfill the responsibilities of a class representative.

**C. Plaintiffs Fail to Carry Their Burden on Rule 23(b).**

Because Plaintiffs seek class certification under Rule 23(b)(3), they also carry the burden of demonstrating predominance and superiority.  They fail to do so.

**1. Even If There Were Issues Capable of Classwide Adjudication, They Do Not Predominate Over Individual Issues.**

The same individualized issues pertaining to contractual conditions and the course of dealings with each borrower that defeat commonality also defeat predominance.  Even if Plaintiffs

-30-

could identify some tangential common issue that satisfies Rule 23(a)(2), it would not predominate over individualized questions. That was the primary basis for the denial of class certification in *HAMP*, where the Court found that the "separate evidentiary hearings" on the satisfaction of contract conditions "for many if not all of the proposed class members . . . will predominate in determining Bank of America's liability as to each plaintiff." 2013 WL 4759649 at *11-12; *see also Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 530 (S.D. Cal. 2011) (no predominance where "an individual inquiry into the handling of each class member's claim would be necessary to determine whether a breach occurred"). The individual questions that predominate here include: Did each borrower properly accept the offer? Was a contract formed? What conditions did the contract place on performance? Did the borrower satisfy them? Did Bank of America perform its obligations under the contract in a timely fashion? If not, was the borrower damaged by the delay—and, if so, how?

The issue of damages poses a particular problem for Plaintiffs, because they do not suggest any common method for assessing damages for the class. This alone is fatal to their motion. The Supreme Court firmly established in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), that a plaintiff seeking class certification carries the burden of "establishing that damages are capable of measurement on a classwide basis." Plaintiffs do not even attempt to carry this burden, instead relying on the contention that "individual issues, such as damages calculations, do not preclude class certification"—for which they cite a case decided *before Comcast*, and which echoes a contention made in the *dissenting* opinion in *Comcast. Compare* Mot. at 14 *with* 133 S. Ct. at 1437 (Ginsburg, J., dissenting).

But even if this principle survived *Comcast* (which is at best an open question), the principle that individualized damages issues do not *necessarily* preclude class certification does not mean that individualized damages issues can *never* preclude class certification. The predominance requirement of Rule 23(b) means that individualized damages issues *do* preclude class certification where those issues predominate over the common question. Plaintiffs cannot carry their burden on predominance simply by making the naked contention that individualized damages calculations will not preclude class certification: the burden of satisfying Rule 23 rests on

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                          Case No. 2:12-CV-02502-GEB-KJN

them, and they must therefore *affirmatively show* that these concededly individualized issues will not predominate over questions they believe can be adjudicated on a class basis.  But Plaintiffs do not even hint at (much less explain or demonstrate) any common formula or approach to calculating damages that would apply to all members of the putative class.  Thus, each putative class member's damages claim would need to be considered and analyzed separately, without any reference to a common formula or other common approach.  Indeed, Plaintiffs' own damages theories rest on individualized evidence and confirm that no common method is possible:

> ➢ On their contract claim and California Consumer Credit Reporting Agencies Act ("CRAA") claim, Plaintiffs seek "monetary damages from damage to their credit." Compl. ¶¶ 30, 58.  Courts have repeatedly found this so individualized as to defeat class certification, because it cannot be measured simply by comparing credit scores and instead requires testimony specific to each individual about what credit they sought and failed to obtain or obtained at a higher cost. *E.g.*, *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690, 697 (S.D. Fla.  2001) (damages for "loss of . . . ability to obtain credit" "requir[e] complex individualized determinations"); *In re Montano*, 488 B.R. 695, 714 & n.25 (Bankr. D. N.M. 2013) (denying class certification because "to show and quantify actual injury each Member would have to introduce his or her own proof" of damages such as "increased difficulty in obtaining credit [or] higher borrowing costs"); *see also generally In re Knickerbocker*, 827 F.2d 281, 290 (8th Cir. 1987) ("damages award for harm to credit reputation" requires "evidence of actual injury").  To prove credit damage, Plaintiffs will also have to disentangle whatever effect Bank of America had on their credit from other events that negatively affected their credit, ███████████████████████████████. *See* Ex. 1 at ¶¶ 23-38; Ex. 12.  Plaintiffs' own credit history suggests that Bank of America's reporting had no effect at all on their ability to obtain credit ███████████████████████ (*see id.*), but even if Plaintiffs take issue with this analysis, that is a dispute that would have to be litigated separately for every putative class member.

> ➢ On their California Rosenthal Act claim, Plaintiffs seek damages for "emotional distress."  Compl. ¶ 74.  Claims for "emotional distress damages . . . require individualized proof that must be presented by each class member separately." *Augustin v. Jablonsky*, 819 F. Supp. 2d

153, 166 (E.D. N.Y. 2011); *accord*, *e.g.*, *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 680 (N.D. Cal. 2011) ("emotional distress damages could involve intensive individualized inquiry").

➤ On their CRAA claim, Plaintiffs also seek damages for "loss of wages" and "pain and suffering."  Compl. ¶ 59.  But "predominance is lacking," and "the multitude of individualized issues . . . would entail complicated mini-litigations within the class action itself," where class members "would need to present evidence of their individual pain and suffering [and] the particular amount of their lost wages." *True v. Conagra Foods, Inc.*, 2011 U.S. Dist. LEXIS 6770, at *14 (W.D. Mo. Jan. 4, 2011); *see also*, *e.g.*, *Thomas v. Arrow Fin. Servs., LLC*, 2006 U.S. Dist. LEXIS 63156, at *15 (N.D. Ill. Aug. 17, 2006) (where claims "require individualized hearings to assess damages for pain and suffering, individual issues predominate"); *Stephens v. Seven Seventeen HB Phila. Corp. No. 2*, 2004 U.S. Dist. LEXIS 14597, at *18-19 (E.D. Pa. July 28, 2004) (where class members seek damages for, inter alia, "mental and emotional distress," "we must . . . deny class certification pursuant to Rule 23(b)(3) because individual issues relating to damages will predominate over any common issues"); *Ramirez v. Trans Union, LLC*, 301 F.R.D. 408, 424-25 (N.D. Cal. 2014) (no predominance because CRAA "requires a showing of actual harm" and plaintiffs proposed no method for showing actual harm classwide).

➤ On their UCL claim, which "is equitable in nature," Plaintiffs can seek injunctive relief or restitution, but not damages.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009).  Although Plaintiffs *assert* that "common issues predominate for the UCL claims" (Mot. at 15), they do not propose any method at all for assessing on a class basis what "money or property" the Plaintiffs themselves and each putative class member lost that can be recovered via restitution.  Cal. Bus. & Prof. Code § 17204.  Predominance is therefore lacking.  *See Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 533, 537 (S.D. Cal. 2011) (common issues did not predominate because "an individualized analysis would be necessary to determine whether restitution is appropriate and, if so, the amount of any restitution"); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 459-60 (S.D. Cal. 2014) (no predominance where plaintiffs failed to propose  "a viable method" for quantifying the amount of restitution); *In re Google AdWords Litig.*, 2012 WL 28068, at *16 (N.D. Cal. Jan. 5, 2012) ("individualized issues of restitution permeate the class claims");

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                                     Case No. 2:12-CV-02502-GEB-KJN

1   *Red v. Kraft Foods, Inc.*, 2012 WL 8019257, at \*11-12 (C.D. Cal. Apr. 12, 2012) (method of

2   calculating restitution "too onerously fact-intensive to be consistent with the predominance or

3   manageability requirements").

4         **2.  Plaintiffs Fail to Show That a Class Action is a Superior Method of Adjudication.**

5         Plaintiffs' primary superiority argument—that the putative class members have "no

6   realistic ability to litigate this case against Bank of America individually" (Mot. at 16)—is

7   demonstrably false because "as the many mortgage-related cases in the federal courts attest,

8   individual plaintiffs are normally well-motivated to bring any claims they might have in order to

9   save their homes." *HAMP*, 2013 WL 4759649, at \*14.  Plaintiffs themselves say they filed this

10  suit because they had "no alternative but to seek judicial intervention to halt the sale of their

11  home." Compl. ¶ 29.  It cannot be true that putative class members have "no realistic ability" to

12  litigate their claims and yet "no alternative" not to do so.  The truth is that borrowers who claim

13  they were harmed by the mishandling of loan modifications can and do bring individual actions

14  (there have been hundreds of them), including with respect to FHA-HAMP specifically.  *E.g.*,

15  *Beatty v. Bank of Am., N.A.*, 2012 WL 1606358 (S.D. Tex. Apr. 30, 2012) (alleging Bank of

16  America did not honor an FHA-HAMP permanent modification contract).  Superiority is lacking

17  where individual remedies are available, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235

18  (9th Cir. 1996), and "[t]his is not a case where the amounts at stake for individuals are so small

19  that separate suits would be impracticable." *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 633

20  (3d Cir. 1996).

21

22  ///

23

24  ///

25

26  ///

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION           Case No. 2:12-CV-02502-GEB-KJN

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.

Respectfully submitted,

Dated: June 2, 2015                    By:    /s/   Alyssa Sussman
                                              JAMES W.  MCGARRY (*pro hac vice*)
                                              *jmcgarry@goodwinprocter.com*
                                              STEVEN A.  ELLIS
                                              *sellis@goodwinprocter.com*
                                              ALYSSA A.  SUSSMAN (*pro hac vice*)
                                              *asussman@goodwinprocter.com*
                                              **GOODWIN PROCTER LLP**

                                              Attorneys for Defendants:
                                              BANK OF AMERICA, N.A., and BANK OF
                                              AMERICA CORPORATION

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    Case No. 2:12-CV-02502-GEB-KJN